# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (470) 257-8156 | )<br>)<br>)  Case No.  **19-MJ-2189**<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Possession with intent to distribute controlled substances and Conspiracy to possess with intent to distribute controlled substances |

The application is based on these facts:
See attached statement. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by DEA. See 18 U.S.C. §§ 3122(b), 3123(b)  */s/ Amanda Klopf*
AUSA AMANDA KLOPF

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DEA TFO Michael Galluzzi
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/12/2019

*Judge's signature*

City and state: Nashville, TN            Hon. Jeffery S. Frensley, Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (470) 257-8156 | Case No. **19-MJ-2189**<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Galluzzi, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (470) 257-8156, with listed subscriber **Marquel D. Peoples**, 2401 Lakeshore Dr., Apt 124, Old Hickory, TN, whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Task Force Officer (TFO) of the Drug Enforcement Administration (DEA). As such, I am an "investigative or law enforcement officer" of the United States within the

meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1) and Tennessee State Law.

4. I have been a Task Force Officer with the DEA since April 30, 2019, and I am presently assigned to the Nashville District Office. I am also employed by the State of Tennessee Office of the Inspector General ("Tennessee OIG") and have been so employed since October 2014. I have been assigned to the TENNCARE Fraud Division for the past approximately four and a half years. I have participated in investigations regarding fraudulent claims to TENNCARE.

5. Prior to my employment at Tennessee OIG, I was employed by the Metro of Nashville Police Department ("MNPD") for 17 years. For 12 years while at MNPD, I was assigned as a detective in the narcotics division. During my time at MNPD I worked with DEA, and participated in numerous narcotics investigations, involving Title III wire investigations, executing search warrants, and narcotics and money recovery. I participated in investigations involving unlawful importation and exportation of controlled substances, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments.

6. I have participated in all aspects of drug investigations, including the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of electronic communications, investigative interviews, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and electronically recorded conversations. I have spoken on

numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and distributors.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Unless otherwise indicated, all statements related herein are related in substance and in part, and are not verbatim. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b) have been committed, are being committed, and will be committed by **Marquel PEOPLES aka "Worm"**. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

9. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10. In August 2019, the Drug Enforcement Administration (DEA) Nashville District Office Tactical Diversion Squad began assisting the Tennessee Bureau of Investigation (TBI) and the Lavergne Police Department (LPD) in investigating **Marquel PEOPLES aka "Worm"** regarding possible violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b) in the Middle District of Tennessee.

11.     On August 15, 2019, LPD arrested an individual on charges related to heroin trafficking. At the residence where the individual was arrested, investigators seized blue, pink, gray and brown powder. The Tennessee Bureau of Investigation's drug lab conducted a preliminary analysis of the blue substance and determined it to contain heroin. In an effort to gain favorable consideration on these pending drug related charges, the individual, hereinafter referred to as Cooperating Defendant or CD-1, agreed to cooperate with law enforcement as to the source of the heroin.

12.     On August 20, 2019, LPD Detective John Krauss, TBI ASAC Dennis Mabry and Murfreesboro Police Department (MPD) Detective Merrill Beene went to the Rutherford County jail to interview CD-1. At the outset of the interview, CD-1 was advised of his/her *Miranda* rights, which CD-1 waived. During the course of the interview CD-1 told investigators he/she bought the blue heroin from two brothers in the Antioch, Tennessee area. CD-1 knew one brother as "Worm." Investigators have previously identified "Worm" as **Marquel PEOPLES** and have identified **PEOPLES**'s brother as Christopher Johnson. CD-1 stated "Worm's" telephone number was in CD-1's phone. Pursuant to a Rutherford County, Tennessee state search warrant for the contents of CD-1's telephone, investigators found the name "Worm" with the telephone number (707) 273-8926 listed in the contact list of CD-1's telephone. According to CD-1, **PEOPLES** sold the blue heroin for $3,200-$3,600 for fifty grams, which **PEOPLES** classified as two ounces (technically, two ounces is 56 grams). The CD-1 described the blue heroin as being very strong. The first time CD-1 used the blue heroin he/she overdosed. According to CD-1, **PEOPLES** also sold brown/gray heroin for $1600 per ounce (25 grams).

13.     At a second interview, which took place on August 21, 2019 at the Rutherford County jail, CD-1 identified a Tennessee driver's license photograph of **Marquel PEOPLES** as

4

"Worm." CD-1 estimated he/she had purchased a total of three to six kilograms of heroin from **PEOPLES** in the past six months.

## CS-1 Purchase of Blue Heroin on August 26, 2019

14.     On August 26, 2019, utilizing a confidential informant (CS-1), LPD, TBI and MPD made a controlled phone call to the (707) 273-8926 in order to arrange the purchase of approximately seven grams of blue heroin from **PEOPLES**. CS-1 is cooperating with law enforcement on behalf of CD-1 in hopes that CD-1 will receive lenient treatment for pending/potential drug charges. Following the recorded phone call, CS-1 told investigators the person on the phone sounded like **PEOPLES**'s partner. CS-1 did not know his name or any nicknames, but stated the partner rode with **PEOPLES** and assisted **PEOPLES** in distributing heroin. Investigators believe this person to be Christopher Johnson. CS-1 and Johnson set the deal to occur in the same place where they had met on previous purchases, the Dollar General Market at 5445 Nolensville Road, Nashville, Tennessee. Prior to and after the controlled buy, law enforcement searched CS-1 and the vehicle driven by CS-1, with negative results. CS-1 was given $600 in prerecorded U.S. Currency to purchase seven grams of the blue heroin. CS-1 was provided with monitoring equipment that enabled law enforcement to listen to the controlled buy as it occurred.

15.     CS-1 arrived at the Dollar General and backed into a parking spot. Shortly thereafter, Johnson arrived in the parking lot of the Dollar General, driving a white Nissan Altima with Virginia license plate UAZ-4007. Investigations observed a black male driving the vehicle, who they were later able to positively identify as Johnson. He backed into a parking space. Approximately one minute later, investigators observed CS-1 throw the pre-recorded U.S. Currency out of the passenger window into the driver's side window of Johnson's vehicle.

Investigators then observed Johnson throw a package into the passenger's side of CS-1's vehicle. When investigators met up with CS-1 following the controlled buy, CS-1 turned over a package containing a blue substance, believed to be heroin. CS-1 stated the person who sold him/her the heroin was **PEOPLES**'s partner. As described below, CS-1 later identified a Tennessee driver's license photograph of Johnson as the person who sold the seven grams to him/her. Lab results are pending on this evidence.

## CS-1 Purchase of Evidence on August 29, 2019

16. On August 29, 2019, LPD, TBI, MPD and the DEA Tactical Diversion Squad (TDS), met with CS-1 for the purpose of making another controlled purchase of blue heroin from **PEOPLES** and/or Johnson. CS-1 positively identified a Tennessee Driver's License photo of JOHNSON as the person CS-1 purchased blue heroin from on August 26, 2019. CS-1 made a controlled phone call to the for the purpose of setting up a second controlled purchase of blue colored heroin.

17. Once the (707) 273-8926 was answered, CS-1 confirmed to investigators it was **PEOPLES** talking on the phone. During the course of this conversation, a detective operating in the undercover capacity (UC), got on the phone and spoke with **PEOPLES**. During this conversation, the UC talked with **PEOPLES** about increasing the quantity of heroin CS-1 was going to purchase that night from one ounce for $2,500 to two ounces for $5,000. The UC said he/she wanted the blue heroin and **PEOPLES** said "we started the blue..." and later stated "if you got the blue stuff, [CI-1] got it from us." The UC then gave the phone back to CS-1, who set the deal up to take place at McDonalds, located at 5800 Old Hickory Blvd., Hermitage, Tennessee. Law enforcement searched CS-1 and the vehicle driven by CS-1 with negative results. CS-1 was given $5,000 in prerecorded U.S. Currency to purchase two ounces of blue

6

heroin from **PEOPLES**. CS-1 was provided with monitoring equipment that enabled law enforcement to listen to the controlled buy as it occurred.

18. CS-1 went to the McDonalds. A short time later, surveillance units observed a red Dodge Charger (the "Charger") arrive at the McDonalds. CS-1 then received a call from (707) 273-8926 and recognized the voice on the phone to be that of **PEOPLES**. **PEOPLES** told CS-1 to pull out and go to the stop sign. CS-1 pulled onto Sells Dr., Hermitage, Tennessee, and pulled up to the stop sign. The Charger pulled up next to CS-1's vehicle and stopped. Law enforcement observed CS-1 pass items through CS-1's vehicle's window to the Charger, and the driver of the Charger pass CS-1 a bag.

19. After the deal was complete, investigators retrieved a baggie containing blue suspected heroin from CS-1. CS-1 told investigators it was too dark to identify who was in the Charger. Investigators weighed the blue suspected and determined it was not two ounces, but approximately 51 grams. Investigators instructed CS-1 to contact **PEOPLES** on the (707) 273-8926 to discuss the shortage. **PEOPLES** answered the (707) 273-8926 and stated all two ounces was there, it was just packed tightly. CS-1 ended the call. At the direction of the investigators, CS-1 called the (707) 273-8926 again to ask **PEOPLES** if CS-1 could give **PEOPLES**'s telephone number, the (707) 273-8926, to the UC so the UC could order heroin directly from **PEOPLES**. **PEOPLES** agreed. Lab results are pending on this evidence.

### UC Purchase of Evidence on September 5, 2019

20. On September 5, 2019, the UC placed a call to the (707) 273-8926 for the purpose of setting up the purchase of four ounces of blue heroin. **PEOPLES** answered the phone and set the deal to occur at the TA Truck Stop at exit 62 off of Interstate 24. **PEOPLES** agreed to sell the UC four ounces of blue heroin for $10,000.

7

21. The UC arrived in the parking lot of the truck stop and called **PEOPLES** on the (707) 273-8926. **PEOPLES** stated he was almost to the location. A short time later, **PEOPLES** contacted the UC and moved the meet location to the Subway/Citgo station located at 13001 Old Hickory Blvd., Antioch, Tennessee. Shortly after the UC arrived at Subway, law enforcement observed the Charger pull into the parking lot and go behind the building near the diesel pumps and stop. **PEOPLES** then called the UC and told the UC to follow him (the Charger) and the Charger left the parking lot. **PEOPLES** then turned right on Firestone Parkway and right on Gould Boulevard, which is a dead end street.

22. The UC pulled up to the driver's side of the Charger and handed **PEOPLES** a plastic bag containing $10,000 in prerecorded U.S. Currency. **PEOPLES** rolled up the window and the UC could see Johnson, sitting in the passenger seat, counting the money. While Johnson was counting the money, **PEOPLES** again rolled down the window and showed the UC a bag containing the blue heroin. **PEOPLES** advised the UC that **JOHNSON** was counting the money and rolled the window back up. **PEOPLES** rolled the window back down and advised the UC the money was $200 short. The UC denied being short and told **PEOPLES** to count it again. **PEOPLES** said he would count it later and handed the UC the plastic bag containing the blue suspected heroin. Following the deal, investigators recounted the copied money and discovered it was, in fact, $40 short. The UC made a controlled phone call to **PEOPLES** on the (707) 273-8926 and explained the shortage and said he/she would make it up to **PEOPLES** on the next deal. The blue suspected heroin was taken to Lavergne Police Department and put into evidence. Lab results are pending on this evidence.

### Identification of Subject Telephone

23. Based on public database searches, investigators learned that Jasmine Preston, the

8

girlfriend of **PEOPLES**, is associated with telephone number (615) 881-1036. In addition, **PEOPLES** provided this telephone number on his Tennessee driver's license application. Subscriber and toll information was obtained via Administrative Subpoena for (615) 881-1036 in an effort to determine additional telephones used by **PEOPLES**. The subscriber for (615) 881-1036 returns to Markia Peoples, who is believed to be the sister of **Marquel PEOPLES**. Analysis of the toll records revealed the most frequently called number to be **(470) 257-8156 (Subject Telephone)**. Investigators know **PEOPLES** has been known to use phones with area codes outside of the Nashville area.

24. Subscriber and toll records were obtained via Administrative Subpoena for **(470) 257-8156 (Subject Telephone)** revealed the phone to be subscribed to **Marquel PEOPLES**, with the address 2401 Lakeshore Dr., Apt 124, Old Hickory, TN. A search of utilities for 2401 Lakeshore Drive., Apt 124, Old Hickory, TN shows that **PEOPLES** had utilities at this address from October 2, 2017 through August 31, 2018.

25. Analysis of the tolls for the **Subject Telephone** reveal contact with the following numbers between the dates of July 24, 2019 and September 10, 2019, who are family or close associates of **PEOPLES**:

   a. (615) 881-1036 – As previously described above, believed to be used by Jasmine Preston, girlfriend of **PEOPLES**. The **Subject Telephone** has approximately 1,160 contacts with this number, which is twice as much as the next most frequently called number on the **Subject Telephone**'s tolls.

   b. (615) 525-8294 – According the driver's license application for Courtland Johnson, a brother of **PEOPLES**, (615) 525-8294 is used by Marquez Peoples, another brother. The **Subject Telephone** has approximately 89

9

contacts with this number; which is the tenth most frequently called number.

c. (707) 273-8926 – Also previously described above, this phone is used by the **Target Subject** and his brother, Christopher Johnson, to sell heroin. The **Subject Telephone** has approximately 25 contacts with this phone.

26. Therefore, I believe the **Subject Telephone** is used by **PEOPLES**.

### Information About T-Mobile

27. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

10

28. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

29. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

30. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

31. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify

11

confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct **T-Mobile** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

33. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

## **CONCLUSION**

31. Your Affiant believes that there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b) have been committed, are being committed, and will continue to be committed by **Marquel PEOPLES aka "Worm"** and his co-

conspirators. Further, your Affiant believes there is probable cause to believe that **PEOPLES** is using the **Subject Telephone** to commit those violations.

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number (470) 257-8156, with listed subscriber **Marquel D. Peoples**, 2401 Lakeshore Dr., Apt 124, Old Hickory, TN, whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b) involving **Marquel PEOPLES aka "Worm"** and **Christopher JOHNSON** and their co-conspirators.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.